IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No.  39692-4-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| ADRIAN MENDOZA, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, C.J. — Adrian Mendoza pleaded guilty to one count of

second degree murder with a firearm enhancement, for which the trial court imposed a

high-end standard range sentence.  Because Mendoza was 17 years old when he

committed the murder, adult criminal court had jurisdiction over his case, absent

agreement by the parties and court approval to remove the case to juvenile court.

Mendoza argues that RCW 13.04.030(1)(e)(v) violates equal protection and due

process.  This statute originally required all 16- and 17-year-old youths who commit

serious crimes to be automatically declined from juvenile court to adult court.  In 2009,

the legislature amended the statute by adding a new subsection, subsection (III).  This

subsection gives prosecutors an important role in deciding which auto decline cases to

remand back to juvenile court. Mendoza points to various infirmities in the new

subsection and urges us to declare the broader statute, RCW 13.04.030(1)(e)(v),

unconstitutional. We decline his invitation.[1] We additionally reject his sentencing

challenge and generally affirm, but remand for the trial court to strike two costs.

FACTS

*Incident and murder charge*

Before dawn on May 5, 2019, Andrea Nunez and her boyfriend walked past a

home in Kennewick, Washington, where Adrian Mendoza, a gang member, was visiting

gang associates. After Ms. Nunez passed the home, Mendoza, accompanied by gang

associates, left the home, stalked Ms. Nunez and her boyfriend, and—after calling out a

gang identifier—fired several shots, one of which killed Ms. Nunez and her unborn child.

Mendoza fled the scene and eventually fled to Oregon. After reviewing footage of

the shooting captured on a neighbor's security camera and after finding Mendoza's cell

phone discarded near Ms. Nunez's body, law enforcement obtained a warrant for

Mendoza's arrest. Officers apprehended Mendoza when he attempted to return to

Washington.

---

[1] It is the 2009 amendment, not the broader statute, that gives rise to Mendoza's constitutional challenges. Supplemental briefing convinces us, were we to agree with Mendoza's constitutional challenges, the proper remedy would be to strike only the amendment.

Once in custody, Mendoza consented to an interview in which he misled officers

as to (1) his presence at the home near the shooting, (2) his presence in the street at the

time of the shooting, (3) the identity of the shooter, and (4) the identity of the men who

accompanied the shooter.

The State charged Mendoza with one count of first degree murder. In addition to

this charge, Mendoza—despite being 17 years old at the time of the murder—had an

extensive criminal history. Most relevantly, Mendoza in the 15 months preceding Ms.

Nunez's murder had been charged with three weapons-related offenses: (1) unlawful

possession of a firearm, (2) criminal mischief with a deadly weapon, and (3) assault in

the second degree (with a firearm). While awaiting trial for Ms. Nunez's murder,

Mendoza also was charged with possessing methamphetamine in the Benton County jail.

At an initial hearing, the State informed the trial court that it would charge

Mendoza as an adult and would not permit a transfer to juvenile court. The record does

not show that Mendoza ever requested such a transfer.

*Plea and sentencing*

Two years after the murder, one of Mendoza's accomplices—Marin Rivera—gave

a statement to law enforcement implicating Mendoza in the crime. As a result of this

statement, the State reduced Mr. Rivera's own charges and imposed a duty to testify. Mr.

3

Rivera pleaded guilty and soon thereafter Mendoza agreed to plead guilty to second degree murder with a firearm enhancement.

Mendoza appeals.

## ANALYSIS

A.    Constitutional challenges

Mendoza argues that RCW 13.04.030(1)(e)(v) violates the equal protection and the due process clauses of our state and federal constitutions.  In general, the statute gives adult criminal court automatic jurisdiction when a 16- or 17-year-old youth commits certain violent offenses.

Subsection (III) of this provision, added in 2009, provides: "The prosecutor and respondent may agree to juvenile court jurisdiction and waive application of exclusive adult criminal jurisdiction in (e)(v)(A) through (C) of this subsection and remove the proceeding back to juvenile court with the court's approval."  Mendoza argues that various infirmities in subsection (III) result in the broader statute being unconstitutional. For the reasons below, we disagree.

*1.    Reviewability*

The State asks that we not review Mendoza's constitutional challenges because he failed to raise them below.  We believe review is warranted.

4

We generally decline to review arguments raised for the first time on review. RAP 2.5(a). Nevertheless, we will review a claim of manifest error affecting a constitutional right. RAP 2.5(a)(3).

For a claim of constitutional error to be manifest, the appellant must show that the error caused "actual prejudice"—meaning that the error resulted in "'practical and identifiable consequences'" in the case. *State v. O'Hara*, 167 Wn.2d 91, 98-99, 217 P.3d 756 (2009) (quoting *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007)).

Here, were we to accept Mendoza's claim that RCW 13.04.030(1)(e)(v) is unconstitutional *and* that the proper remedy would be to invalidate the broader statute rather than merely subsection (III), assertion of adult court jurisdiction over his case would have been improper, and he would not have received a high-end adult sentence. We conclude that Mendoza's constitutional claims of error are manifest and proceed to review their merits.

2.      *Equal protection analysis*

"Equal protection requires that persons similarly situated with respect to the legitimate purpose of the law receive like treatment. U.S. CONST. amend. XIV, § 1; WASH. CONST. art. I, § 12." *State v. Simmons*, 152 Wn.2d 450, 458, 98 P.3d 789 (2004). "Equal protection is not intended to provide complete equality among individuals or classes but equal application of the laws." *Id.* "A party challenging the application of a

5

law as violating equal protection principles has the burden of showing that the law is irrelevant to maintaining a state objective or that it creates an arbitrary classification." *Id.*

Mendoza argues that RCW 13.04.030(1)(e)(v)(III) creates an arbitrary classification between "juveniles who are mandated to continue under exclusive original adult criminal jurisdiction and those who receive special treatment without reference to any criteria or guidelines and are referred to juvenile court jurisdiction." Br. of Appellant at 24-25. We disagree that the provision creates an arbitrary classification.[2]

"The Washington State Legislature created our juvenile court system and therefore has the power to define its jurisdiction." *State v. Watkins*, 191 Wn.2d 530, 536, 423 P.3d 830 (2018). By enacting RCW 13.04.030(1)(e)(v), the legislature decided that 16- and 17-year-old youths who commit certain serious offenses should be tried in adult court. In 2009, the legislature softened the section by enacting subsection (III), which gives prosecutors an important role in determining which auto decline cases to remove back to juvenile court.

---

[2] Citing *State v. Schaaf*, 109 Wn.2d 1, 743 P.2d 240 (1987), Mendoza argues we should apply strict scrutiny review because the statute affects his fundamental liberty interest. *In Schaaf*, the court applied rational basis review and held that juveniles did not have a fundamental liberty interest in receiving a jury trial. *Id.* at 17-21. *Schaaf*, therefore, does not directly support Mendoza's strict scrutiny argument.

As noted previously, the constitutional infirmity—if one exists at all—lies in the 2009 amendment, which *lessens* the potential punishment for older youths accused of serious crimes. A classification that *lessens* potential punishment does not affect liberty in such a way to warrant increased scrutiny.

There is nothing arbitrary about giving prosecutors an important role in determining whether to prosecute serious offenses committed by older youths in juvenile court. Prosecutors decide whether to bring charges, what charges to bring, and whether to offer reduced charges and reduced sentences to respondents. By giving prosecutors an important role in deciding whether to remove serious crimes committed by older youths to juvenile court, subsection (III) provides older youths a greater opportunity for rehabilitation—the focus of juvenile court.

### Schillberg *distinguished*

In support of his equal protection argument, Mendoza offers *State ex rel. Schillberg v. Cascade District Court*, where our Supreme Court invalidated a provision requiring prosecutorial consent before a trial court could offer a defendant deferred prosecution. 94 Wn.2d 772, 781, 621 P.2d 115 (1980). However, the court's decision in *Schillberg* relied on the determination that deferred prosecution was, by another name, a sentence the trial court imposed. *Id.* at 777. Accordingly, a prosecutorial veto over deferred prosecution amounted to a prosecutorial veto over a sentencing decision. *Id.* at 781. The court invalidated the provision because permitting such a veto unconstitutionally delegated judicial power to the executive. *Id.*

By contrast, the provision Mendoza challenges allows the prosecutor and the older youth to recommend to adult court whether to remove a case back to juvenile court. The

adult court, ultimately, decides whether the case will be removed. This process does not unconstitutionally delegate judicial power to the executive. More important, *Schillberg* does not support Mendoza's equal protection challenge because *Schillberg* did not decide any equal protection question.

Tracy M. *distinguished*

Mendoza also cites *State v. Tracy M.*, 43 Wn. App. 888, 720 P.2d 841 (1986), for the proposition that RCW 13.04.030(1)(e)(v)(III) must impose guidelines that limit prosecutorial discretion. However, *Tracy M.*—like *Schillberg* before it—dealt with prosecutorial diversion (or deferment) rather than jurisdictional transfer. *Tracy M.*, 43 Wn. App. at 888-89. Because both deferment and diversion are forms of sentencing, they necessarily implicate judicial power. *Id.* at 891. Accordingly, a statute that enables prosecutors to grant or withhold diversion must also provide guidelines within which prosecutors may exercise that discretion. A statute lacking such guidelines unconstitutionally delegates judicial power. *Id.* at 892.

By contrast, the statute Mendoza challenges deals only with jurisdictional transfer, not with diversion or deferment. As already established, the statutory provision does not delegate judicial power.

Also, while *Tracy M.* did resolve an equal protection challenge, Mendoza incorrectly argues that "no violation of equal protection occurred . . . because there *were*

8

clear standards for the discretionary decision." Br. of Appellant at 27 (alteration in original). On the contrary, *Tracy M.* found that equal protection was *not* violated because the appellant in that case could not show that the government's disparate treatment was both unreasonable and "amounted to intentional or purposeful systematic discrimination in the enforcement of the law." 43 Wn. App. at 893.

Lastly, Mendoza argues that subsection (III) provides no criteria to guide prosecutors discretion when deciding which cases to transfer from adult court to juvenile court. Mendoza discusses multiple studies that conclude that Black and Latinx youths are tried in adult court disproportionately compared to white youths. He argues that the legislature's failure to provide meaningful criteria to prosecutors and the legislature's failure to allow respondents to file a motion to remove to juvenile court further exacerbate this inherent discrimination against youths of color. We agree that the statute can be improved. But this alone, is an insufficient reason to declare the broader statute unconstitutional.[3]

---

[3] Mendoza makes valid points of how subsection (III) can be improved. We encourage the legislature to include criteria in that subsection to guide prosecutors in deciding whether to remove cases to juvenile court. In addition, the legislature should consider whether to amend the subsection to allow respondents to file a motion to remove to juvenile court, so that they may argue that the new criteria are met. This would add an additional safeguard to protect against inherent discrimination.

3.      Due process analysis

Mendoza next argues that RCW 13.04.030(1)(e)(v)(III) violates due process

because it does not provide for a hearing ahead of a court's determination of jurisdiction.

For the reasons explained below, we disagree.

A respondent under juvenile court jurisdiction is entitled to a hearing before that

court, of its own discretion, transfers the respondent to adult court.  *Kent v. United States*,

383 U.S. 541, 557, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966).  Our Supreme Court has held

that "the right to be tried in a juvenile court is not constitutional and the right attaches

only if a court is given statutory discretion to assign juvenile or adult court jurisdiction."

*State v. Salavea*, 151 Wn.2d 133, 140, 86 P.3d 125 (2004).

Under subsection (III), the court cannot remove the prosecution of an older

youth's serious offense from adult court to juvenile court without the juvenile's consent.

Because the subsection does not permit a change in jurisdiction without the juvenile's

consent, a juvenile has no constitutional right to a *Kent* hearing.

B.      Sentencing challenge

*Facts pertinent to sentencing challenge*

Ahead of sentencing, the State filed a memorandum requesting a high-end

sentence of 294 months, which included a 60-month firearm enhancement.  By contrast,

Mendoza requested a 101-month juvenile rehabilitation term (which constituted the

maximum juvenile rehabilitation term, given Mendoza's age).  Both parties reminded the court of its obligation, at sentencing, to consider Mendoza's age at the time of the offense.

In addition to the parties' recommendations, the court considered Dr. Alexander Patterson's psychological evaluation of Mendoza.  In that evaluation, Dr. Patterson concluded that youthfulness had significantly contributed to Mendoza's offense.  Specifically, Dr. Patterson stated that Mendoza's crime was "impulsive, reckless . . . and showed virtually no appreciation for potential consequences, including . . . facing a murder charge that would completely upend his life."  Clerk's Papers (CP) at 154.

Dr. Patterson's evaluation also summarized (1) Mendoza's self-reported personal history, and (2) Mendoza's own account of the crime.  According to Mendoza, he had suffered severe parental neglect from an early age and had also suffered physical and sexual abuse.  As a result, Mendoza had done poorly in school, eventually dropped out of school, joined a gang, and begun abusing alcohol and drugs.  When asked to describe Ms. Nunez's murder, Mendoza characterized the crime as accidental and motivated by self-defense.[4]

---

[4] Dr. Patterson's report determined that Mendoza tended to exaggerate his psychological problems and noted that Mendoza's scores on his psychological test were random and uninterpretable.  In addition, Dr. Patterson's report discounts contradictions between what Mendoza reported to him and the video evidence and eyewitness reports of

11

No. 39692-4-III
*State v. Mendoza*

Ultimately, the trial court adopted the State's recommendation and sentenced

Mendoza to 294 months. When announcing its sentence, the court acknowledged its

obligation to consider Mendoza's youthfulness and explicitly analyzed the youthfulness

factors enumerated in *State v. Houston-Sconiers*.[5] However, the court determined that

despite Mendoza's youthfulness, the circumstances of the crime warranted a sentence at

the high end of the statutory range. In addition, the court found Mendoza indigent yet

imposed a $500 victim penalty assessment (VPA) and a $100 DNA collection fee.

*Sentencing analysis*

Mendoza argues the trial court erred where it sentenced him without, as our

constitutions require, considering the mitigating qualities of youth. We disagree.

*Standard of review*

Where an appellant challenges a sentence within the standard range, our court will

review that challenge only to determine whether the trial court, in imposing the sentence,

complied with statutory and constitutional requirements. *State v. Osman*, 157 Wn.2d

474, 481-82, 139 P.3d 334 (2006). If the appellant shows constitutional error related to

his sentencing, our court presumes the error prejudicial unless the State proves beyond a

_____

the killing. Dr. Patterson's report also discounts the many times that Mendoza lied to
police during the police interview.
    [5] 188 Wn.2d 1, 391 P.3d 409 (2017).

12

reasonable doubt that the error was harmless. *State v. Delbosque*, 195 Wn.2d 106, 129, 456 P.3d 806 (2020).

### *Mitigating qualities of youth*

Because "children are different," a trial court sentencing a juvenile must "consider mitigating qualities of youth . . . and must have discretion to impose any sentence below the otherwise applicable [Sentencing Reform Act of 1981, chapter 9.94A RCW] range." *Miller v. Alabama*, 567 U.S. 460, 481, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012); *State v. Houston-Sconiers*, 188 Wn.2d 1, 21, 391 P.3d 409 (2017).

When discharging this duty, trial courts "must do far more than simply recite the differences between juveniles and adults." *State v. Ramos*, 187 Wn.2d 420, 443, 387 P.3d 650 (2017). Instead, courts must meaningfully consider those qualities of youth that bear on the appropriateness of a sentence, including the respondent's "'immaturity, impetuosity, and failure to appreciate risks and consequences.'" *Houston-Sconiers*, 188 Wn.2d at 23 (quoting *Miller*, 567 U.S. at 477). The court "must also consider factors like the nature of the juvenile's surrounding environment and family circumstances, the extent of the juvenile's participation in the crime, and 'the way familial and peer pressures may have affected him.'" *Id.* (quoting *Miller*, 567 U.S. at 477). Finally, the court "must consider how youth impacted any legal defense, along with any factors suggesting that the child might be successfully rehabilitated." *Id.*

Here, the trial court thoughtfully weighed the above factors.  The court considered whether Mendoza's actions evinced impetuosity but concluded that Mendoza's deliberate decision to arm himself, leave his associate's home, and stalk the victim suggested methodical intent.  The court considered whether Mendoza's immaturity prevented him from discerning right from wrong but concluded that Mendoza's decision to flee the scene, flee the State, and then lie during police interviews demonstrated his appreciation for the wrongfulness of his actions.  The court further concluded that Mendoza's long history with law enforcement and the juvenile justice system would have developed his ability to appreciate the risks and consequences of his actions.

The court also considered Mendoza's childhood environment and family upbringing.  While the court noted Mendoza's unfortunate and challenging past, it concluded that Mendoza's assertive participation in the index crime and consistent involvement with weapons outweighed those considerations.  The court also noted that despite being with others on the night of the crime, Mendoza ignored "opportunities . . . that could have led to a different outcome."  Rep. of Proc. (Apr. 21, 2023) (RP) at 64.

Finally, the court considered Mendoza's potential for rehabilitation and indeed expressed hope that Mendoza could be rehabilitated.  As supporting this hope, the court cited testimony from Mendoza's family members stating, in effect, that they would "not

give up on [Mendoza]." RP at 64. The court noted that even at the end of a lengthy

sentence, Mendoza would have "more than half of [his] life to live." RP at 65.

Admittedly, the trial court at sentencing did not allude to the findings in Dr.

Patterson's forensic evaluation of Mendoza. In that evaluation, Dr. Patterson concluded

that "factors related to youth played a direct role in the behavior leading to Mr.

Mendoza's arrest." CP at 155. Dr. Patterson further concluded that contrary to the trial

court's view, Mendoza's behavior was "impulsive, reckless . . . and showed virtually no

appreciation for potential consequences, including . . . facing a murder charge that would

completely upend his life." CP at 154. In sum, the report argues forcefully for a

mitigated sentence.

However, certain elements of Dr. Patterson's report would justify the trial court in

discounting it. First, Mendoza in his interview with Dr. Patterson continued to minimize

his crime. Specifically, Mendoza characterized Ms. Nunez's murder as being accidental,

reactive, and arising from self-defense, notwithstanding clear video evidence to the

contrary. Second, Dr. Patterson's conclusions do not reference the accelerating pattern of

criminality Mendoza exhibited prior to the murder. In the 15 months preceding the

murder, Mendoza had incurred charges for three separate weapons-related offenses:

unlawful possession of a firearm, criminal mischief with a deadly weapon, and assault

with a firearm.

15

The court was justified in disregarding Dr. Patterson's conclusion that Ms. Nunez's murder was the impulsive result of Mendoza being intoxicated and reacting to a tense situation. Instead, the crime was simply the next offense in a progression of increasingly serious offenses, all involving deadly weapons.

In sum, the trial court at sentencing meaningfully considered mitigating qualities of youth. Where the court overlooked aspects of Dr. Patterson's report, it was justified in doing so. The court's fair analysis warranted a high-end sentence.

### *Legal financial obligations*

Mendoza argues the trial court should not have imposed the VPA and DNA collection fee because the legislature has eliminated the former fee for indigent defendants and the latter fee for all defendants. We agree.

Under RCW 7.68.035(4), trial courts must not impose the otherwise mandatory VPA on indigent defendants. Moreover, the legislature has eliminated DNA collection fees for all defendants. *See* LAWS OF 2023, ch. 449, § 4. These changes apply to defendants whose direct appeals are not final. *State v. Ellis*, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023).

Because the trial court found Mendoza indigent—and because his appeal is not yet final—we remand to strike the challenged costs.

No. 39692-4-III
*State v. Mendoza*

Affirmed, but remanded to strike VPA and DNA collection fee.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_Lawrence-Berrey, C.J._
Lawrence-Berrey, C.J.

I CONCUR:

_Cooney, J._
Cooney, J.

17

No. 39692-4-III

FEARING, J. (dissent) —

"But even if he has been wicked," pursued Rose, "think how young he is; think that he may never have known a mother's love, or the comfort of a home; that ill-usage and blows, or the want of bread, may have driven him to herd with men who have forced him to guilt. Aunt, dear aunt, for mercy's sake, think of this, before you let them drag this sick child to a prison, which in any case must be the grave of all his chances of amendment." Charles Dickens, *Oliver Twist*.

I concur in this court's ruling regarding the constitutionality of RCW 13.34.030(1)(e)(v). I dissent to this court's affirmation of the sentence imposed on Adrian Mendoza. Despite my high regard for the sentencing court, I conclude the court, because of Adrian's youth, abused its discretion when sentencing Adrian to the highest possible sentence within the adult standard range. The court recited many of the *Miller* factors without critically applying the factors. The court took facts that prove Adrian's teenage immaturity and flipped those facts to purportedly demonstrate adult maturation. The court sentenced Adrian as an adult with a cursory and conclusory analysis of his youth and adolescent mentality. The sentencing court adultified a homeless, drug addicted, Latinx teen gang member. A child orphaned by his mother for drugs, fending for himself on scrabbled streets, seeking belonging from gang members, and drowning

sorrow in the bosom of methamphetamine and cocaine may appear to live as an adult, but he remains a child. Living as an adult does not make one an adult.

-----------------------------------------

My dissent begins with Adrian Mendoza's personal background, moves to the few facts known about the crime, mentions landmark decisions on juvenile sentencing, discusses principles attended to appraising the *Miller* factors, and ends with an analysis of Adrian's sentencing.

I take Adrian Mendoza's personal history from a report by clinical and forensic psychologist Dr. Alexander Patterson, a probation compliance report summary, and the sentencing hearing. The State did not dispute Adrian's Dickensian childhood. The State did not present a report from any alternate psychologist. The sentencing court indicated it had read Patterson's report.

Adrian Mendoza was born in 2001 and lived most of his life in the Tri-Cities. Authorities deported his father shortly after Adrian's birth, and Adrian has not seen the father since. The father may have been murdered in Mexico. Adrian's mother suffered from substance abuse and socialized with others using illicit drugs.

Adrian Mendoza's mother began distributing Adrian, at an early age, to others for his care. In perhaps a confused order, Adrian listed some of his ersatz caregivers. Adrian lived with his mother's boyfriend's family until the boyfriend entered prison. He then lived with a foster mother, Gloria. While Adrian lived with Gloria, one of Gloria's sons sought to perform oral sex on Adrian, but quit when Adrian grew scared. Gloria's son

2

insisted that Adrian tell no one about their secret. Then the jailed boyfriend's parents reassumed custody.

Adrian lived in Oregon with extended family at some unidentified time. Some man at the Oregon location sexually touched him during the night. At the Oregon residence, someone may have placed miniature cars in Adrian's anus. An unidentified caregiver did not feed Adrian for days.

When Adrian Mendoza attended sixth grade, he returned to his mother's care for two years. Adrian and his mother then resided in a trap house. Gang members loitered at the home. During these two years, Adrian's mother was often arrested. On at least one occasion, law enforcement officers awakened Adrian and a sister while pointing a gun at their respective heads.

Adrian reported physical abuse as a child, but could not recall details. He witnessed violence between his mother and her boyfriends. On one occasion, Adrian intervened while a boyfriend struck his mother. The boyfriend shoved Adrian from the altercation. Adrian suffered constant verbal abuse from his mother.

When Adrian Mendoza attended eighth grade, foster mother Anita cared for him. He increasing grew independent during adolescence and often lived with friends.

School officials placed Adrian Mendoza in special education because of his ADHD. Officials occasionally suspended him because of ill behavior. Adrian attended an alternative school for a stint, but was expelled for smoking marijuana. Adrian left schooling permanently in the ninth grade.

3

Adrian commenced drinking alcohol and smoking marijuana at age ten. He started using cocaine at age thirteen and methamphetamine at age fourteen. One boyfriend of his mother hosted dope parties and encouraged Adrian to participate in the drugfest. Adrian used alcohol, marijuana, methamphetamine, and cocaine throughout his adolescence. At age seventeen, he also used heroin. By the time of his psychologist's interview in December 2019, Adrian recognized himself as a former drug addict. Adrian commented:

> "I didn't know I was ruining my life at the time. I see everybody else doing it and I thought it was the right thing to do."

Clerk's Papers (CP) at 145.

At age thirteen Adrian Mendoza formally joined the Westside 18th gang, although he had spent time with the group earlier. During his interview, Adrian explained:

> I felt like they [the gang] cared more than anybody else. Yeah, I did get high and stuff, but they gave me clothes, and when I had nobody, they'd drink with me. They'd give me things to help me out. . . . I had nobody, so it was like the family that I never had.

CP at 145.

Before May 2019, the month of Adrian Mendoza's slaying of Andrea Nunez, the State had, during the years, brought five charges against Adrian in juvenile court. Authorities first arrested and sent Adrian to detention at age thirteen. The charge may have stemmed from throwing rocks at cars. When Adrian reached fourteen years of age, officers arrested him for driving without a license. At age 16, the juvenile court found Adrian guilty of unlawful possession of a firearm and, in a separate incident, criminal

4

mischief with a deadly weapon. During a gang fight, Adrian had swung a padlock tied to a bandana. The padlock struck a girl's head.

In March 2019, Adrian Mendoza, while a passenger in a car, allegedly pointed a firearm at another individual. Police later seized a 9 mm handgun from Adrian. These charges remained pending at the time of the May 5, 2019 shooting.

As a result of the various juvenile charges, the juvenile court placed Adrian Mendoza under community supervision. During this supervision, he violated parole conditions ten times for failing to remain under parental care, failing to remain in contact with his community custody officer, using controlled substances, missing school, and failing to complete community service hours. Juvenile authorities referred Adrian to substance abuse treatment, aggression replacement training, an employment program, and gang intervention education. Adrian did not complete any of the programs because of failing to attend or his misbehavior during the programs.

At age of fifteen, Adrian Mendoza began a relationship with an eighteen-year-old woman. Adrian impregnated the woman. The girlfriend gave birth after Adrian's arrest for murder. The girlfriend ended contact with Adrian after his jailing for homicide.

--------------------------------------------------------

I take the facts of the crime from a law enforcement officer's affidavit of probable cause. Because of a guilty plea, no trial amplified the facts.

On May 5, 2019, Adrian Mendoza was seventeen. On that and the previous day, he drank alcohol, smoked marijuana and methamphetamine, and used cocaine. He had

been awake for four days. He socialized the night of May 4 and early morning of May 5 with gang members Ezekiel Sanchez and Marin Rivera at Sanchez's apartment.

At 4:15 a.m., Adrian Mendoza and fellow gang members noticed rival gang members, Joseph Ayala and Andrea Nunez, walk past the apartment. Adrian and Rivera left the apartment and approached Ayala and Nunez. Adrian yelled "Westside." CP at 3. Nunez responded "Southside." CP at 3. Adrian removed a gun from his clothing and shot several times. One bullet killed a then pregnant Nunez. A video camera captured the scene of the shooting.

Adrian dropped his cellphone at the site. He fled to Oregon, but was detained on May 6 in this neighboring state. During a law enforcement interview, Adrian constantly changed his story from not having been at the friend's house, to being at the friend's house but not going outside, to Marin Rivera being the shooter and dropping Adrian's cellphone.

------------------------------------------------------

The State of Washington charged Adrian Mendoza in adult court with first degree murder. Adrian entered a plea of guilty to second degree murder and the superior court sentenced him four years later.

At the request of defense counsel, clinical and forensic psychologist Alexander Patterson conducted a psychological evaluation of Adrian Mendoza and formed an opinion on the role of Adrian's youthfulness in the crime. Patterson reviewed charging information, the declaration of probable cause, police reports, video footage from the

6

night of the crime, and the criminal history of Adrian. Dr. Patterson performed testing of Adrian that included the Shipley Institute of Living Scale, the Personality Assessment Inventory, the Millon Clinical Multiaxial Inventory, the Adverse Childhood Experience Questionnaire, and the Psychopathy Checklist Revised. Patterson interviewed Adrian twice, once for two hours and another time for forty-five minutes. Psychologist Patterson also interviewed Adrian's sister, Jessica, for forty-five minutes.

Dr. Alexander Patterson noted that Adrian, like many other troubled youth, turned to a gang for support and belonging. In fact, gang members raised Adrian. Adrian suffered sexual abuse, physical abuse, neglect, and abandonment. During a crucial stage of psychological development, gang and family members introduced Adrian to harmful substances. Use of drugs throughout his adolescence disrupted Adrian's development. Adrian missed stable and loving interpersonal bonds while maturing, a condition stunting his development.

Psychologist Alexander Patterson opined that Adrian Mendoza remained in a pre-adolescent psychological stage at the time of the murder. Chronic trauma and substance abuse arrested his social and psychological maturation. In contrast, Adrian had begun to develop and mature during his four years of incarceration since the shooting.

According to psychologist Patterson, Adrian Mendoza, at the time of his crime, possessed traits of impulsivity, irresponsibility, juvenile delinquency, and an unhealthy need for excitement and stimulation. Patterson predicted a low chance of recidivism with

7

Adrian's receiving treatment and retaining sobriety. Patterson, however, worried about the influences Adrian would encounter in prison.

In his report, Dr. Alexander Patterson also noted advancements in science concerning brain development. Scientific studies show that the prefrontal cortex of the brain controls an individual's ability to plan actions and to foresee future consequences of momentary decisions. This cortex develops last in time, and a person does not fully mature until his mid-20s.

Dr. Patterson opined that Adrian Mendoza's behavior showed hallmarks of youthfulness. At the time of the murder, an intoxicated Adrian acted impulsively and recklessly, while showing no appreciation for the consequences of his behavior. He lacked a plan to kill, but instead reacted to the verbal altercation with rival gang members. Adrian acted from a childish desire to impress older gang members. Adrian's childhood retarded his brain development beyond the typical maturity of other children of his age. His use of alcohol and methamphetamine amplified his impulsiveness at the time of the killing.

As part of plea negotiations, the State reduced Adrian Mendoza's charge to second degree murder. The superior court proceeded with a sentencing hearing on that charge in April 2023, four years after the killing. We do not know the reason for the four-year delay in proceedings other than perhaps the COVID epidemic. The superior court sentenced Adrian as an adult in adult court.

8

Adrian Mendoza's adult standard range was 134 to 234 months, with an additional sixty-month firearm enhancement increase. The State asked for a sentence of 294 months, or 26.5 years, the maximum sentence under the adult standard range.

During the sentencing hearing, the State noted that the sentencing court must consider Adrian Mendoza's youthfulness. The State added that it considered Adrian's youth when agreeing to reduce the charge.

During sentencing, the State characterized Adrian Mendoza as a very dangerous person, who understood the consequence of his actions. The State recited Adrian's criminal history. At age fourteen, Adrian unlawfully displayed a weapon. At age sixteen, Adrian unlawfully possessed a firearm. The gun was stolen. Also at age sixteen, Adrian engaged in a gang fight. While on supervision, authorities hailed Adrian into court ten times for probation violations. The juvenile court issued seven warrants for his arrest. Thirty-nine days before the killing of Andrea Nunez, Adrian, while riding in a car, pointed a firearm at another person. The State expressed concern about the quickness of Adrian garnering another firearm after police confiscated a previous one.

During sentencing, the State highlighted that other young men, with gang membership and who experienced a neglected childhood, surmounted disadvantages of their childhood, took advantage of resources, and lived a crime-free life. Others with similar obstacles chose a path different from Adrian Mendoza's course.

According to the State, Adrian Mendoza lived an adult lifestyle for most of his youth. He was neither naïve, nor immature. Thus, according to the State, Adrian did not

9

behave impulsively at the time of the murder. He engaged in an ambush by following the victim, yelling at the victim, shooting the victim, and running from the scene of the crime.

Andrea Nunez's mother spoke at the sentencing hearing. She recognized that her daughter had joined a tough crowd. But her murder was not justified. The mother and Andrea were proud of her becoming pregnant. The death of Andrea left a huge hole in the mother's life.

Defense counsel spoke on behalf of Adrian Mendoza at the sentencing hearing. Counsel noted that she had represented Mendoza for four years. At first, Adrian "was very closed off to" his counsel. He limited communications with counsel. At one time during this representation, Adrian wrote a letter to the court complaining about his counsel's representation and seeking appointment of another attorney.

During sentencing, defense counsel observed that Adrian Mendoza's family, the foster care system, the school system, and the juvenile court system had failed him. No one in the position of authority understood the barriers faced by Adrian. For extended periods of time, Adrian lacked clothing, food, and shelter. His parental figures introduced him, at age ten, to illicit drugs. Few, if any children, suffer the childhood that Adrian experienced.

During the four years that counsel represented Adrian Mendoza in this prosecution, counsel observed Adrian's maturation with changes in thoughts and speech. According to counsel:

10

> [W]hen we talk about youthfulness and brain development, I literally sat in the front row and watched it all with Mr. Mendoza.

Report of Proceedings (RP) at 38. Adrian chose to move to another jail wing where his gang held less influence and where Adrian found resources for advancement. He entered the jail's suboxone program and later weaned himself from suboxone.

Defense counsel, during sentencing, noted the impulsiveness of the shooting. The confrontation began with yelling gang names in the street. Adrian Mendoza had not known in advance that rival gang members would walk by the apartment.

Counsel ended by importuning that, under prison conditions, Adrian Mendoza would not receive rehabilitation. His counsel asked for a sentence of 101 months in a juvenile facility. According to counsel, sentencing Adrian to a higher term would place him in prison, where a gang would proselytize him.

Jessica Allen, Adrian Mendoza's older sister, spoke during sentencing. She mentioned the struggles that both she and Adrian encountered from living in the streets. Sometimes, Adrian did not know where he would sleep at night. Their mother never provided love, attention, or a stable home. Jessica confirmed that her brother had been sexually assaulted. Jessica emphasized that her brother "literally had no guidance in his life" and experienced a "robbed childhood." RP at 48.

A second sister of Adrian Mendoza, Monica Mendoza, also spoke at the sentencing hearing. At a young age, the mother sent Monica to her grandmother's residence in Texas, but Adrian stayed behind in Washington. Monica spoke of the lack

of support from the mother. The mother passed Adrian from one person to another. At other homes, Adrian received verbal abuse. Adrian worried each day from where he would receive food and where would sleep at night. Because Adrian lacked a father, he turned to gang life.

Adrian Mendoza addressed the sentencing court. When he began, he found his emotions precluded him from speaking, so his defense counsel read a statement Adrian had prepared for himself to read. Adrian agreed he had made poor choices as a teenager, but the worse choice he had made occurred on May 5, 2019, when he shot the gun. Adrian mentioned that, ever since he could remember, his only influences were violent, drug addicted, and gang related. No one taught him the difference between right and wrong. Because of his lengthy incarceration, he no longer deemed himself to be a member of a gang. During this time, he became sober for the first time since age ten. In jail, he read self-help books on overcoming anger. He now understood right from wrong.

Adrian Mendoza stated:

> I am sincerely and undeniably sorry to the families that will never be able to hug their daughter again. I am so sorry to her and her friends and her family who don't get to see her grow up or hear her laughter again. I am sorry.

RP at 56. He added later:

> I know that my actions on May 5th were terrible and horrific. I apologize for not knowing better. I feel horrible. If I could take it back, I would in an instant. If I could take away the pain, I would gladly. If there were words to express how much I regret my decisions that day, I would say them again and again, day after day. I hope to pray that the few words I

12

do know and what I have learned being in here reaches the family's heart so they can have some peace in knowing and understanding.

I think about those choices daily and it brings something new to my life that until recently I didn't know what it was or I even had such emotions and feelings. This was pain or tightness in my chest. I found out it was called remorse and regret. It floods me with emotions every time I think about that day.

RP at 58. Adrian's statement continued:

Your Honor, I know that I must deal with the consequences for my actions and I stand here, a healing man, willing to accept the consequences for whatever you see fit. I just ask that you please hear me and understand my situation I've been placed in since a young age. I ask to please understand my upbringing, drug addiction and mental development at the time of the crime and where I am now with understanding and growth and the ability to learn from the situation. I don't want to experience anything like this ever again. I am still a kid on the inside and want to be able to take this awful, life-ruining experience and learn to grow from it. Take the time you give me to obtain my GED and further education and possibly become a counselor to teach and save others in similar situations, as mine were, and help them make better decisions and be able to tell them my story. Possibly save their lives from making the same decisions I unfortunately did.

RP at 59.

During the sentencing court's ruling, the court recognized discretion to impose a sentence under the standard range of 194 to 294 months. But, the court issued the highest sentence of 294 months. The sentencing court highlighted the violence behind the crime. The court denied the killing as impulsive. Adrian knew he did wrong because he fled the scene. During a police interview, Adrian sought to protect himself. According to the court, Adrian should have taken opportunities to rehabilitate himself while previously in the juvenile court system, but he chose otherwise. Adrian was a major participant in the

crime. The court found disturbing the ability of a young man, such as Adrian, to readily

gain access to guns.

During the sentencing hearing, the court spoke of Adrian Mendoza's childhood:

> The Court does have to weigh Mr. Mendoza's surrounding
> environment and his family upbringing. I will be honest, it was very
> difficult to read Mr. Mendoza's family upbringing. It was hard to
> understand that. Your attorney did an excellent job for this Court to
> understand Mr. Mendoza's upbringing.

RP at 63. The sentencing court made no further mention of Mendoza's childhood.

The sentencing court never addressed the psychological report prepared by Dr.

Alexander Patterson other than to state that she had read it. The court never mentioned

why she rejected the opinions expressed by Patterson that the crime was impulsive. The

court mentioned the need to weigh familial and peer pressure that impacted Mendoza, but

did not comment on the impact except to say:

> He had many opportunities, in my opinion, that could have led to a
> different outcome.

RP at 64. The court concluded that Adrian could be rehabilitated, but failed to account

for the rehabilitation already accomplished by Adrian while in jail. The superior court

did not enter any written findings of fact.

-----------------------------------------------------------

The United States Supreme Court's decisions in *Miller v. Alabama*, 567 U.S. 460,

132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012) and *Montgomery v. Louisiana*, 577 U.S. 190,

136 S. Ct. 718, 193 L. Ed. 2d 599 (2016) and the Washington Supreme Court's decision

14

in *State v. Houston-Sconiers*, 188 Wn.2d 1, 391 P.3d 409 (2017) brought promise for juvenile offenders. The decisions recognized the foolhardiness of sentencing juveniles as adults, and the rulings directed that youth already sentenced to long terms should have those sentences reviewed and reduced based on factors now known as *Miller* factors. The decisions brought hope to juvenile offenders for a mature life without constant caging.

In the previous century, American jurisprudence treated teenage murderers the same as adult murderers. Juvenile courts rotely declined jurisdiction over a teenager accused of murder, and the adult courts prosecuted and sentenced teenagers as if adults. A fifteen-year-old, who committed a crime, was deemed as blameworthy as a fifty-year-old, who committed the same crime. *In re Boot*, 130 Wn.2d 553, 569-70, 925 P.2d 964 (1996).

In the 1980s and early 1990s, rising crime rates pushed academics and the media to create the phantom juvenile super-predator to justify harsher punishment and prosecuting youth in adult court for violent crimes. JEFFREY BUTTS & JEREMY TRAVIS, URBAN INSTITUTE, THE RISE AND FALL OF AMERICAN YOUTH VIOLENCE: 1980 TO 2000 (2002), https://www.urban.org/sites/default/files/publication/60381/410437-The-Rise-and-Fall-of-American-Youth-Violence.PDF. The super-predator craze particularly targeted Black and brown children, who were demonized by the battle against crime, war on drugs, social panic, racialized fears, and discredited science. The super-predator theory employed and amplified racial stereotypes that date back to the founding of our

15

nation and accelerated during Reconstruction. *State v. Belcher*, 342 Conn. 1, 17, 268 A.3d 616 (2022). In 2001, the United States Office of the Surgeon General labeled the super-predator theory a myth. UNITED STATES OFFICE OF THE SURGEON GENERAL, YOUTH VIOLENCE: A REPORT OF THE SURGEON GENERAL ch. 1, at 5 (2001), https://www.ncbi.nlm.nih.gov/books/NBK44297/?report=reader).

Beginning in 2005, the United States Supreme Court acknowledged advances in neurological science. The federal Supreme Court thereafter issued landmark decisions, under the Eighth Amendment's cruel and unusual punishment clause, concerning juvenile offender sentencing. *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005); *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed 825 (2010); *Miller v. Alabama*, 567 U.S. 460 (2012); and *Montgomery v. Louisiana*, 577 U.S. 190 (2016).

The prefrontal cortex, an important part of one's brain, sits at the front of the frontal lobe, which lies immediately behind the forehead. This cortex connects to many other parts of the brain and sends and receives information. The prefrontal cortex engages in self-reflection, memory, and emotional processing, and conducts sensory processing, motor control, and performance monitoring. Arain M, Haque M, Johal L, et al., Maturation of the adolescent brain, Neuropsychiatric Disease and Treatment, April 3, 2013 | https//pubmed.ncbi.nih.gov/23579318. This cortex controls one's behavior and impulses, delays instant gratification, makes decisions, solves problems, plans long term goals, balances short-term rewards with future goals, adapts one's behavior as situations change, understands and predicts one's behavior, synthesizes many streams of

information, and focuses one's attention. Arain M, Haque M, Johal L, et al., Maturation of the adolescent brain, Neuropsychiatric Disease and Treatment, April 3, 2013 | https//pubmed.ncbi.nih.gov/23579318.

A growing body of longitudinal neuroimaging research has demonstrated that the brain continues to grow and change during adolescence, thereby modernizing longstanding assumptions that the brain ceased maturing by puberty. J.N. Giedd et al., *Brain Development during Childhood and Adolescence: A Longitudinal MRI Study*, 2 NATURE NEUROSCIENCE 861 (1999) https//pubmed.ncbi.nih.gov/10491603. The prefrontal cortex of the brain grows as a person matures from childhood to early adulthood. The cortex is one of the last parts of the brain to develop completely. In general, the prefrontal cortex does not fully mature until age 25, which prompts car insurance companies to charge higher rates until a person turns 25 because those younger are high-risk drivers. The prefrontal cortex assesses risk-taking and decision-making, both important for driving. Tobias Grossmann, *The Role of Medial Prefrontal Cortex in Early Social Cognition*, 7 FRONTIERS IN HUMAN NEUROSCIENCE 340 (2013), https://doi:10.3389/fnhum.2013.00340.

An unfortunate accident that injured railroad worker Phineas Gage prompted scientist to study the brain's topography and to note the brain's functioning as influencing one's personality and character. In 1848, a metal rod passed through Gage's brain and obliterated his left frontal lobe, including the prefrontal cortex. He improbably survived, and he gained other employment. Although the passage of time has exaggerated his

mental condition thereafter, Gage became impulsive and lost the ability to plan. Ricardo Teles, *Phineas Gage's Great Legacy*, 14 DEMENTIA & NEUROPSYCHOLOGIA 419 (2020), https://www.demneuropsy.com.br/wp-content/uploads/articles_xml/1980-5764-dn-14-04-0419/1980-5764-dn-14-04-0419.pdf. His memory and general intelligence faded. John M. Harlow, *Recovery from the Passage of an Iron Bar through the Head*, 4 HIST. PSYCHIATRY 274 (1993) (reprinted from 1869).

According to the United States Supreme Court, the cruel and unusual punishment clause demands that the penal system treat offenders under the age of eighteen differently. Children's lack of maturity and underdeveloped sense of responsibility lead to recklessness, impulsivity, and heedless risk taking. *Miller v. Alabama*, 567 U.S. 460, 471 (2012). Children are more vulnerable to negative influence and outside pressure from family and peers, have limited control over their environments, and lack the ability to extricate themselves from horrific, crime-producing settings. *Miller v. Alabama*, 567 U.S. 460, 471 (2012). Adolescent brains are not yet fully mature in regions and systems related to higher order executive functions such as impulse control, planning, and risk avoidance. *Miller v. Alabama*, 567 U.S. 460, 475 n.5 (2012). All of these features impact a tendency to commit a crime. *Miller v. Alabama*, 567 U.S. 460, 473 (2012). Commonsense, parental knowledge, physical science, and social science confirm these observations. *Miller v. Alabama*, 567 U.S. 460, 472 n.5 (2012). Because a child's character is not as well formed as an adult's, the child's traits are less fixed, and his actions are less likely to be evidence of depravity. *Miller v. Alabama*, 567 U.S. 460, 471

18

(2012). Only a relatively small proportion of adolescents who engage in illegal activity develop entrenched patterns of problem behavior. *Roper v. Simmons*, 543 U.S. 551, 570 (2005).

According to the United States Supreme Court, the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes. *Miller v. Alabama*, 567 U.S. 460, 472 (2012). Deterrence supplies a flawed rationale for punishment because of juveniles' impulsivity and inability to consider the consequences of their actions. *Miller v. Alabama*, 567 U.S. 460, 472 (2012). Retribution's focus on blameworthiness also does not justify a lengthy sentence because juveniles have severely diminished moral culpability. *Miller v. Alabama*, 567 U.S. 460, 472 (2012). Incapacitation fails to justify a long sentence because adolescent development diminishes the likelihood that an offender forever will be a danger to society. *Miller v. Alabama*, 567 U.S. 460, 472-73 (2012).

With a new understanding of juvenile brain development, the United States Supreme Court established strictures on harsh and long sentences for teenagers, even youth committing murder. The Eighth Amendment's cruel and unusual punishment clause compelled these sentencing restrictions.

Because of the constitutional nature of children, including teenagers, the United States Supreme Court, in *Miller v. Alabama*, 567 U.S. 460 (2012), mandated that a sentencer follow a process that incorporates consideration of the offender's age and its hallmark features and other mitigating features before imposing life without parole. The

attended characteristics include: (1) chronological age, (2) immaturity, impetuosity, failure to appreciate risks and consequences, (3) the surrounding family and home environment, (4) the circumstances of the offense, (5) the extent of the offender's participation in the offense, (6) any pressures from friends or family affecting him, (7) the inability to deal with police officers and prosecutors, (8) incapacity to assist an attorney in his or her defense, and (9) the possibility of rehabilitation. *Miller v. Alabama*, 567 U.S. 460, 477-78, 489 (2012). Courts now call these characteristics "the *Miller* factors." Under the cruel and unusual punishment clause, sentencing courts must exercise their discretion at the time of sentencing with regard to the youth of the offender, regardless of what opportunities for discretionary release may occur in the future. *Miller v. Alabama*, 567 U.S. 460, 477-83 (2012); *State v. Houston-Sconiers*, 188 Wn.2d 1, 20 (2017).

The Washington Supreme Court has ruled that Washington Constitution's article I, section 14, which prohibits cruel punishments, extends greater protections to offenders, including juvenile offenders. *State v. Bassett*, 192 Wn.2d 67, 79-80, 428 P.3d 343 (2018). Going further, in *State v. Houston-Sconiers*, 188 Wn.2d 1 (2017), the Washington Supreme Court addressed *Miller v. Alabama*'s applicability to juvenile defendants who receive lengthy sentences for crimes other than homicide. The Evergreen high court held that sentencing courts possess absolute discretion to depart as far as desired below the otherwise applicable Sentencing Reform Act of 1981, ch. 9.94 RCW, ranges when sentencing juveniles in adult court. Sentencing courts also may exercise the prerogative to reduce or ignore sentencing enhancements. To the extent

20

Washington sentencing statutes had been interpreted to bar such discretion with regard to juveniles, the high court deemed the statutes unconstitutional. Rendering sentences routinely imposed on adults will often be too harsh when applied to youth. *State v. Houston-Sconiers*, 188 Wn.2d 1, 19, 391 P.3d 409 (2017).

*Houston-Sconiers* extended protections against disproportionate punishment to all juveniles subject to the adult sentencing reform act of 1981 sentences and enhancements. *State v. Harris*, ____ Wn.3d ____, ____, 559 P.3d 499 (November 27, 2024). The Washington Supreme Court further extended the dictates of the *Miller* factors to young adults who were nineteen and twenty years old at the time of their offenses because of lack of full brain development until age 25. *In re Personal Restraint of Monschke*, 197 Wn.2d 305, 313, 482 P.3d 276 (2021).

----------------------------------------------------

The requisite sentencing hearing for a juvenile in adult court, under Washington jurisprudence, is no longer an ordinary sentencing proceeding. *State v. Ramos*, 187 Wn.2d 420, 443, 387 P.3d 650 (2017). *Miller v. Alabama* establishes an affirmative requirement that courts fully explore the impact of the defendant's juvenility on the sentence rendered. *State v. Ramos*, 187 Wn.2d 420, 443 (2017). The court must receive and consider relevant mitigation evidence bearing on the circumstances of the offense and the culpability of the offender, including both expert and lay testimony as appropriate. *State v. Ramos*, 187 Wn.2d 420, 443 (2017). The court and counsel have an affirmative duty to ensure that proper consideration is given to the juvenile's

chronological age and its hallmark features of immaturity, impetuosity, and failure to appreciate risks and consequences. *State v. Ramos*, 187 Wn.2d 420, 443 (2017). The sentencing court must also consider the juvenile's family and home environment, the circumstances of the homicide offense, the extent of the offender's participation in the conduct, and the way familial and peer pressures may have affected him. *State v. Ramos*, 187 Wn.2d 420, 443-44 (2017).

The law demands lighter sentences for juveniles because the prefrontal cortex, where reasoning and morality rest, has yet to fully develop. Presumably all teenagers and early adults lack the full development of the cortex until the approximate age of 25. I know of no instance when the accused juvenile under when a brain study to determine cortex growth. Perhaps then lighter sentences should be automatic. Regardless, courts follow the *Miller* factors that psychologists suggest indirectly measure maturation.

The Washington Supreme Court wrote, in *State v. Houston-Sconiers*, 188 Wn.2d 1, 21 (2017), that trial courts possess complete discretion to weigh the *Miller* factors. One should not take this principle literally, however. Later decisions impliedly restrict unfettered discretion. The discretion does not mean no review of the sentencing court's application of mitigating factors. *State v. Haag*, 198 Wn.2d 309, 326, 495 P.3d 241 (2021). A trial court abuses its discretion when its decision is manifestly unreasonable or based upon untenable grounds. *State v. Delbosque*, 195 Wn.2d 106, 116, 456 P.3d 806 (2020). An abuse of discretion includes a misapplication of the law. *State v. Delbosque*, 195 Wn.2d 106, 116 (2020). The untenable grounds basis applies when the substantial

evidence does not support factual findings. *State v. Delbosque*, 195 Wn.2d 106, 116 (2020). A trial court lacks the discretion to impose a standard range sentence without first considering the mitigating circumstances of youth when the defendant committed the crime as a juvenile. *In re Personal Restraint of Ali*, 196 Wn.2d 220, 231–33, 474 P.3d 507 (2020); *State v. Backstrom*, 15 Wn. App. 2d 103, 106–07, 476 P.3d 201 (2020).

Under precedent, Washington sentencing courts must apply all *Miller* factors, but precedence supplies little instruction on how to employ the factors. The law does not demand that the court numerically calculate the factors favoring the offender and the factors favoring the State. The law says little about the mechanics of balancing the *Miller* factors. Nevertheless, this lack of guidance should not give free reign to the sentencing court to impose a lengthy sentence by simply reciting the *Miller* factors and asserting that it considered each factor.

Despite considerable discretion bestowed sentencing courts, we may glean some important principles behind applying the *Miller* factors. Some of these principles arise from cases wherein the trial court engaged in sentencing a juvenile sentenced to prison for life after a conviction for first degree murder, but the Washington Supreme Court has not distinguished between the numerous settings in which the court sentences a juvenile. The same rules apply to all juvenile cases during which the court sentences the offender as an adult. *State v. Houston-Sconiers*, 188 Wn.2d 1, 19 (2017). The Washington constitution requires trial courts to apply the *Miller* factors regardless if sentencing the youth occurs in juvenile or adult court and regardless of whether the transfer to adult

court is discretionary or mandatory. *State v. Houston-Sconiers*, 188 Wn.2d 1, 19–20 (2017). Because all state courts must follow the dictates of *Miller v. Alabama*, I rely in part on foreign decisions.

The sentencing judge must not simply claim to have followed the *Miller* factors. *People v. Luna*, 2020 IL App (2d) 121216-B, 158 N.E.3d 342, 351, 441 Ill. Dec. 937 After reviewing the evidence, the court must do more than simply recite the differences between juveniles and adults and do more than render conclusory statements that the offender has not justified a downward sentence. *State v. Ramos*, 187 Wn.2d 429, 443 (2017). The court must receive evidence bearing on the circumstances of the offense and the culpability of the offender, including both expert and lay testimony. *State v. Haag*, 198 Wn.2d 309, 320–21. The judge must use the *Miller* factors to evaluate evidence presented at the sentencing hearing. *People v. Luna*, 158 N.E.3d 342, 351 (2020). The court must meaningfully consider how juveniles are different from adults and how those differences apply to the facts of the case. *State v. Delbosque*, 195 Wn.2d 106, 121 (2020); *State v. Ramos*, 187 Wn.2d 420, 434-35 (2017). The sentencing court must thoroughly explain its reasoning, specifically considering the differences between juveniles and adults identified by the *Miller* Court and how those differences apply to the case presented. *State v. Ramos*, 187 Wn.2d 429, 444 (2017). While formal written findings of fact and conclusions of law are not strictly required, they are always preferable to ensure that the relevant considerations have been made and to facilitate appellate review. *State v. Ramos*, 187 Wn.2d 420, 444 (2017).

24

Aggravating factors, including defendant's criminal history, his academic delinquency, and his probation violations must be considered in a different light. *People v. Johnson*, 2020 IL App (3d) 130543-B, 171 N.E.3d 936, 446 Ill. Dec. 831. The sentencing court must filter those factors through the lens of youth and the specific propensities that come with immaturity. *People v. Johnson*, 171 N.E.3d 936, 446.

Sentencing courts must place great emphasis on mitigating factors. *State v. O'Dell*, 183 Wn.2d 680, 696, 358 P.3d 359 (2015). In Washington, the sentencing court must consider the measure of rehabilitation that has already occurred. *State v. Delbosque*, 195 Wn.2d 106, 121 (2020). The hearing must focus on rehabilitation rather than on the past. *State v. Haag*, 198 Wn.2d 309, 321 (2021). Rehabilitation involves the successful completion of vocational, educational, or counseling programs designed to enable a prisoner to lead a useful life, free from crime, when released. *People v. Bennett*, 335 Mich. App. 409, 426–27, 966 N.W.2d 768 (2021).

Sentencing courts must reorient the sentencing analysis to a forward-looking assessment of the defendant's capacity for change or propensity for incorrigibility, rather than a backward-focused review of the defendant's criminal history. *United States* v. *Briones*, 929 F.3d 1057, 1067 (9th Cir. 2019), *rev'd on remand*, 18 F.4th 1170, 35 F.4th 1150 (9th Cir. 2021). The key question becomes whether the defendant is capable of change. *United States* v. *Briones*, 929 F.3d 1057, 1067 (9th Cir. 2019).

Under Washington case law, irreparable corruption or the inability to reform should be rare. *State* v. *Bassett*, 192 Wn.2d 67, 89 (2018). Stated differently, due to

children's diminished culpability and heightened capacity for change, appropriate occasions for sentencing juveniles to the harshest possible penalty will be uncommon. *State v. Ramos*, 187 Wn.2d 420, 444 (2017). A strong presumption of the ability for rehabilitation should follow from this principle. The reality that juveniles still struggle to define their identity undermines a conclusion that a heinous crime committed by a juvenile is evidence of irretrievably depraved character. *Roper* v. *Simmons*, 543 U.S. 551, 570 (2005). Also, a court's emphasis on a juvenile offender's previous failure for rehabilitation does not constitute full consideration of the *Miller* factors. *People v. Mahomes*, 2020 IL App (1st) 170895, 167 N.E.3d 192, 195-96, 445 Ill. Dec. 515.

According to the United States Supreme Court, retribution cannot take precedence in juvenile sentencing. *Miller v. Alabama*, 567 U.S. 460, 472 (2012); *State v. Haag*, 198 Wn.2d 309, 321 (2021). Because the heart of the retribution rationale relates to an offender's blameworthiness, the case for retribution lessens with a minor as with an adult. *Graham v. Florida*, 560 U.S. 48 (2010); *State v. Haag*, 198 Wn.2d 309, 321 (2021).

The sentencing court may disregard unrebutted expert testimony only if an evidentiary basis conflicts with the testimony. *Hall v. State*, 319 So. 3d 691, 697 (Fla. Dist. Ct. App. 2021). The trial court, when ignoring unrebutted expert testimony, must acknowledge and reconcile conclusions reached contrary to the expert opinions. *State v. Delbosque*, 195 Wn.2d 106, 123 (2020).

The State argues that Adrian Mendoza bore the onus of showing his crime resulted from transient immaturity and that his character is reparable. Nevertheless, the offender

only bears the evidentiary burden when he seeks a sentence below the standard range. *State v. Delbosque*, 195 Wn.2d 106, 123 (2020). At sentencing, Adrian's counsel asked for a sentence below the standard range, but on appeal Adrian focuses more on reducing his sentence below the highest possible sentence imposed by the sentencing court. Anyway, I need not allocate the burden of proof, because, even if Adrian shouldered the onus, he provided overwhelming, if not undisputed facts, as to his immaturity at the time of the crime and his positive prospect for rehabilitation since.

-------------------------------------------------------------

I review three Washington Supreme Court decisions, one Washington Court of Appeals decision, and two foreign decisions on sentencing youth in order to guide my decision. I would have placed this lengthy examination of case law in an appendix except that the facts of the decisions loom critical in my later examination of whether the superior court abused its discretion and whether Adrian Mendoza should have received the harshest sentence. Also, we comprehend the law better when a story illustrates the law's intricacies.

In *State v. Delbosque*, 195 Wn.2d 106 (2020), a jury, in 1994, convicted seventeen-year-old Cristian Delbosque with aggravated first degree murder. Under Washington law at the time, Delbosque received a mandatory life sentence without the possibility of release. On October 18, 1993, after heavy drinking, Delbosque brutally murdered Filiberto Sandoval and Kristina Berg. When questioned by police, Delbosque

27

waived his rights and confessed to the murders, although he testified at trial that his girlfriend committed the killings.

The superior court resentenced Cristian Delbosque, in 2016, in accordance with RCW 10.95.035, a portion of the *Miller-fix* statute, which requires resentencing for minors previously sentenced to life without the possibility of parole. The resentencing court imposed a minimum term of forty-eight years without the possibility of parole. The court held a four-day evidentiary hearing pursuant to the *Miller-fix* statute. The State presented testimony from the officer who investigated the crime, the juvenile court officer who interviewed Delbosque for his decline determination, and the unit supervisor of the prison where Delbosque was incarcerated at the time of his resentencing. While incarcerated, Delbosque incurred prison infractions for fighting, extortion, and possession of a weapon, tattoo paraphernalia, and another inmate's property. Prison authorities repeatedly investigated him, while between the ages of 29 and 32, for gang-related violence. His last infraction occurred in 2010 when Delbosque allegedly used his position in a gang to arrange an assault on another inmate. A corrections officer testified that, but for Delbosque's life sentence and immigration detainer, he would be classified as a minimum security prisoner.

During the evidentiary hearing, victim Kristina Berg's family offered six victim impact statements. Cristian Delbosque's siblings testified about his childhood experiences of extreme poverty and losing his mother as a young child. Delbosque confided during his psychiatric evaluations of physical and sexual abuse by multiple

28

family members.  Two experts testified in support of Delbosque.  Dr. Manuel Saint

Martin testified about Delbosque's current psychological state and low propensity for

future dangerousness.  He also concluded that Delbosque likely experienced alcohol-

induced psychosis at the time of the crime.  Dr. Sarah Heavin opined that Delbosque's

executive functioning deficits were likely greater than the average seventeen-year-old

because of his early childhood traumas.

In reaching its sentence of forty-eight years, Cristian Delbosque's resentencing

court considered the *Miller* factors and concluded that the crime committed by Delbosque

qualified as one of those rare cases that netted a long sentence without the possibility of

parole.  The resentencing court found that (1) Delbosque exhibited an ongoing attitude

toward others reflective of the underlying murder whereby he chose to advance his own

needs over others, and (2) the crime was not symptomatic of transient immaturity, but

instead revealed irreparable corruption, permanent incorrigibility, and irretrievable

depravity.  The Court of Appeals reversed Cristian Delbosque's sentence, holding that

substantial evidence did not support the resentencing court's factual findings.

On appeal to the Supreme Court after resentencing of Cristian Delbosque, the

State contended substantial evidence supported the two superior court's findings.  The

Supreme Court disagreed.  The resentencing court cited three factors in support of its

finding: the nature of the crime, Delbosque's attempt at trial to implicate his girlfriend in

Berg's murder, and his institutional record.  With respect to this third factor, the

29

resentencing court focused Delbosque 2010 infraction for allegedly arranging an assault on another inmate. Delbosque was 34 at the time.

The Supreme Court wrote that the resentencing court failed to address the greater prospects for reform from a crime committed while Cristian Delbosque was a child. The resentencing court's reasoning contradicted *Miller*'s recognition that incorrigibility is inconsistent with youth. Under Washington case law, irreparable corruption should be rare.

According to the Supreme Court, the resentencing court oversimplified and sometimes disregarded Cristian Delbosque's mitigation evidence. Dr. Sarah Heavin opined that youthfulness, combined with trauma, rendered Delbosque less likely to monitor his own behavior responsibly, to inhibit aggressive behavior, or to weigh risks. Dr. Heavin asserted that Delbosque lacked good decision-making skills because of the cumulative effect of the various traumas Delbosque experienced, the poverty he suffered, his lack of education, his lack of relative social support, and his alcohol dependence. The resentencing court minimized expert testimony about Delbosque's alcohol addiction at the time of the crime and how alcohol uniquely impacts the developing teenage brain. Dr. Manuel Saint Martin testified that Delbosque's relatively few infractions over a 23-year period, coupled with his progressive decrease in security level, proved he was not irreparable, but could safely be released. The trial court labeled Delbosque as irretrievably depraved without reconciling, much less acknowledging, significant evidence to the contrary.

In *State v. Haag*, 198 Wn.2d 309 (2021), the Washington Supreme Court reversed a sentencing because the resentencing court focused on retribution. The court's focus was backward looking, disregarding the forward-looking focus required by Washington law. The resentencing court weighed what it termed " 'a vile, cowardly, and particularly heinous multi-step strangulation and drowning of a defenseless, sixty-five pound little girl committed by a three hundred pound[,] seventeen-year-old young man' " against the mitigating factors. *State v. Haag*, 198 Wn.2d 309, 315-16 (2021). When the resentencing court considered youth, it primarily focused on the youth of the victim, Rachel Dillard, and not on Haag's youth at the time of the offense. The sentencing court commented that children are our most precious asset, they literally are the future. Rachel was a vessel of hope for the future, but these hopes "were obliterated when Miss Rachel was savagely slain by Mr. Haag." *State v. Haag*, 198 Wn.2d 309, 323-24 (2021). Both of Haag's expert witnesses concluded that he would be at a low risk of reoffending. Expert testimony also provided evidence that Haag had trouble, as a seventeen-year-old, making decisions—even more so than the average juvenile.

*State v. Anderson*, 200 Wn.2d 266, 516 P.3d 1213 (2022) shows a rift, if not a chasm, between members of the Washington Supreme Court. The five-member majority affirmed a lengthy sentence imposed on Tonelli Anderson. Although I agree with the dissenters with regard to its legal analysis and the majority's weakening of guidelines assisting youth during sentencing, I need not rely on the dissent to disagree with this court's majority in Adrian Mendoza's appeal. I recite the facts of both the crime and

criminal prosecution, in *Anderson*, to show the wide divergence between *Anderson* and Adrian Mendoza's circumstances.

In *State v. Anderson*, the superior court imposed a 61-year sentence on Tonelli Anderson for two first degree murders he committed at age seventeen. Anderson claimed this sentence was unconstitutionally cruel in violation of article I, section 14 of Washington's Constitution. The major question on appeal was whether the Washington Supreme Court's recent decision in *State v. Haag* announced a bright line rule that no juvenile offender can ever receive a sentence of 46 years or longer. Anderson argued such. All justices disagreed. But they internally disagreed as to whether Anderson's crimes reflected the mitigating qualities of youth. A majority held that the superior court did not err when reviewing all of the evidence and concluding the crimes did not reflect youthful immaturity, impetuosity, or failure to appreciate risks and consequences. Therefore, Washington's Constitution did not prohibit Anderson's 61-year sentence.

In September 1994, seventeen-year-old Tonelli Anderson and his friend, Porshay Austin, went to James Bateman's home to buy cocaine. Austin had purchased drugs from Bateman twice before. But this time, Anderson and Austin planned to steal Bateman's drugs and to kill him and any witnesses. Austin took the lead. When Anderson and Austin arrived, they sat in the living room and chatted with Bateman. Bateman's partner, Lynell Ricardos, retrieved a quarter kilogram of cocaine from a bedroom. She handed the package to Bateman and returned to the bedroom. When Ricardos left the living room, Austin pulled out a handgun and shot Bateman multiple times. As Austin killed

32

Bateman, Anderson pulled out his own gun and hastened down the hallway to the bedroom. There he found Ricardos, Kristin McMullen, and Ricardos' two-year-old son. Anderson shot each of the women twice, killing McMullen and gravely wounding Ricardos. The crime remained unsolved for one year.

In 1995 after the murders, Tonelli Anderson was adjudicated guilty of various and unrelated juvenile offenses and sentenced to a year in juvenile custody. While in juvenile custody, Anderson wrote about his 1994 slayings in letters to girlfriends. To one girlfriend, he wrote:

> "Remember I told you about that shit me and that [M]exican did down in Kent? Well, it happened again, but this time it happened with Porshay, and we did it for a qua[r]ter kilo of powder! But I messed up and left a witness but they only knew Porshay['[]s name! I think I might [have] left fingerprints, but they haven't c[o]me and charged me.
> I tell you things that if Porshay found out I told you he'd want me to <u>kill</u> you! I already have to worry about that bitch Marcy telling someone what Kim told her. [I]f she does I'll go to the penitent[i]ary for the rest of my life or I can get the death penalty because it was premeditated!"

*State v. Anderson*, 200 Wn.2d 266, 271 (2022)

After his release from juvenile custody, Tonelli Anderson quickly accumulated five adult felony convictions: first degree assault, first degree robbery, unlawful imprisonment, unlawful possession of a firearm, and delivery of cocaine. While Anderson served his sentence for those felonies, the State received an anonymous tip that led investigators to Anderson's inculpatory letters concerning the 1994 murders.

At sentencing in 2000, Tonelli Anderson articulated:

> I understand that the victims' families, you know, feel pain,
> whatever. They expressed it, you know, right here, you know, and—
> (shrugged shoulders)—I can't say that I'm sorry for anything because I'm
> still claiming my innocence.

*State v. Anderson*, 200 Wn.2d 266, 272 (2022). The 2000 sentencing court imposed the longest sentence available within the standard range: 736 months. The court did not, however, address the potentially mitigating qualities of Anderson's youth.

In 2018, Tonelli Anderson moved to be resentenced pursuant to RCW 10.95.030(3)(a)(ii) and *Miller v. Alabama*. He requested an exceptional sentence below the standard range: 320 months, less than half the length of his original sentence. The State urged the resentencing court to re-impose the same sentence of 736 months because the record did not support a conclusion that Anderson's youth diminished his culpability for the offenses. Instead, the 2000 findings showed and Anderson's later letters confirmed a planned and well executed robbery and killing.

At the resentencing hearing, Tonelli Anderson's family testified in support of his request for an exceptional sentence below the standard range. His brother testified that Anderson had grown and changed while in prison. One aunt shared that Anderson's home life was unstable when he was growing up, especially after his mother became addicted to crack cocaine. Another aunt testified that Anderson, as a teenager, made a lot of bad decisions. According to the aunt, Anderson was a follower, not a leader. Anderson apologized for the pain and suffering he had caused. He explained that he stayed in the streets as a teenager to avoid the drug traffic and the prostitution in and out

34

of his house. He testified that he hung around an older crowd and attempted to mimic their behaviors. He further testified that on the night of September 24, 1994, he was asked to be a backup on a drug deal and went along because he sought to make a reputation in the streets. Anderson claimed that his street sense activated such that his travel down the hallway and into the bedroom to shoot Ricardos and McMullen was like an automatic response.

Tonelli Anderson's resentencing court conducted a thorough hearing. The court began its oral ruling by explaining the purpose of a *Miller*-fix resentencing hearing in light of the Supreme Court's decision in *State v. Ramos*. The court acknowledged that most adolescents are not as culpable as adults but determined Anderson's case differed from most. Anderson engaged in additional assaultive criminal behavior after committing the murders, after he reached adulthood, after he lived in a structured environment with treatment at Juvenile Rehabilitation Administration, and before the murder charges. All evidence contradicted Anderson's claim of impetuosity. The robbery and murders were planned in advance by Porshay. Anderson killed McMullen after having an opportunity to deliberate about Bateman's killing. Anderson understood the consequences of his actions because he discussed them in letters. Anderson admitted the murders were premeditated and had even sent a picture of his victims to girlfriends. This behavior showed no remorse. Anderson had never taken responsibility for this crime or several other felonies of which he had been convicted until the resentencing hearing. Anderson consistently denied committing the crimes to the police, in testimony

35

at his trial, at sentencing, and until the day of his resentencing hearing. His history of continual denials seriously undermined Anderson's claim that, for the first time in twenty-three years, he had remorse. The shooting of Ricardos was designed to hinder law enforcement in the investigation showing that Anderson's crimes were thought out, deliberate, and designed to avoid the consequences of his actions.

The dissenting justices determined that the resentencing judge abused her discretion by failing to meaningfully consider how juveniles are different from adults, by failing to critically consider how those differences applied to Tonelli Anderson, by failing to consider whether Anderson's case was one of the few where a life without parole sentence is constitutionally permissible, and by failing to give meaningful weight to the significant evidence that Anderson had rehabilitated himself while in prison. The resentencing court, according to the dissenters, also abused her discretion when allocating the burden of proof to Anderson.

A wide gap separates the circumstances of Tonelli Anderson's crimes and rehabilitation from the context of Adrian Mendoza crime and reform. Anderson and his cohort planned the killings in advance. The pair killed two and severely injured a third. Anderson boasted of the murders afterward. Anderson continued on a spree of violent crimes, even after reaching adulthood. Anderson had no remorse afterward. Adrian Mendoza did not plan the killing in advance with fellow gang members or by himself. The rival gang members fortuitously walked past. Adrian killed one person and has

committed no crimes after he reached the age of majority. Adrian did not kill Andrea

Nunez's companion in order to eliminate witnesses. He expressed deep sorrow.

In *In re Personal Restraint of Miller*, 21 Wn. App. 2d 257, 505 P.3d 585 (2022),

Asaria Miller filed a personal restraint petition, seeking resentencing under *State v.*

*Houston-Sconiers* because the sentencing court did not meaningfully consider mitigating

factors related to her youth at sentencing. In 2012, Miller, a sixteen-year-old Black girl,

and her boyfriend killed her father's ex-girlfriend. Miller's father recruited her to

perform the act. Miller pled guilty in 2013 to the amended charge of first degree murder

with a firearm sentencing enhancement. Miller had an offender score of 3 due to a prior

conviction of first degree assault. Based on Miller's offender score, the standard adult

range for first degree murder was 271 to 361 months. The State and defense counsel both

recommended a sentence of 300 months for first degree murder, plus 60 months for the

firearm enhancement, for a total of 360 months.

The sentencing court rejected the joint recommendation and imposed a total

sentence of 390 months, 30 months greater than the recommendation. In explaining its

decision, the sentencing court noted that, during Miller's testimony at her father's trial,

Miller stated her father asked for her assistance with the murder because of her history of

a prior assault. The court concluded that Miller uttered this answer with a sense of pride.

The court also noted that Miller and her father had justified the murder to each other by

saying, "Millers don't get beat down." The sentencing court briefly referenced Miller's

youth in its decision, saying:

> [I]n taking into consideration of all the factors the parties have said, and the consideration that . . . Miller, at the age of 16, committed a violent offense, having already committed a violent offense, has now set her life. Most young people's lives aren't set in stone by the time they are 17 years old. Yours is.

*In re Personal Restraint of Miller*, 21 Wn. App. 2d 257, 261-62.

In *In re Personal Restraint of Miller*, this court granted Asaria Miller's personal restraint petition. This court noted that the sentencing court must meaningfully consider youth. Although Miller's age was mentioned by the superior court, the court made no direct reference to her maturity or ability to appreciate the consequences of her actions. The sentencing court did not consider factors related to Miller's surrounding environment and family circumstances. Defense counsel may have implied that Miller was influenced by family pressures and was impetuous, but counsel did not directly argue the mitigating qualities of Miller's youth. And although the sentencing court referenced Miller's age once, noting that most individuals' lives are not cast in stone at such a young age, this sole reference fails to show that it meaningfully considered the mitigating factors of Miller's youth.

*People v. Luna*, 158 N.E.3d 342 (2020) bears parallels to Adrian Mendoza's sentencing. A jury, in 2012, convicted Dreshawn Luna, of first-degree murder and aggravated battery with a firearm for crimes committed on July 4, 2010, when he was age fifteen. The trial court sentenced defendant to consecutive prison terms totaling fifty-one years for the first-degree murder conviction, twenty-six years for the murder, plus

twenty-five years as a firearm enhancement, and ten years for the aggravated battery

conviction. The Illinois Court of Appeals remanded for resentencing.

On the evening of July 3, and into the early morning hours of July 4, 2010, a party

happened at the Ramada Inn in Waukegan. Dreshawn Luna played dice and lost money.

Later, in the parking lot, he complained that he needed his money back. His compatriot,

Marquise Coleman asked Luna for his gun. Coleman returned to the party with Luna's

gun and robbed the people playing dice, including Farkhan Jones, at gunpoint. Coleman

returned to the parking lot and handed Luna his gun and the money lost in the game.

Luna waved at a car driving away, motioning for it to stop. Patrick Enis exited the

vehicle and walked to Luna. Enis and Luna engaged in an unfriendly conversation. They

walked toward the driver's side of the car. Luna pointed the gun at the driver, Jones, and

shot. Jones died from his injuries. Luna shot at Enis as he fled.

At the sentencing of Dreshawn Luna, the State emphasized that Luna had a history

of repeated delinquency, which included committing burglary with his older brother at

age nine. An expert deemed Luna as potentially having antisocial personality disorder.

The State asserted that, while detained, Luna had demonstrated a continued lack of

respect for authority. The State argued the absence of any mitigating circumstances and

requested a term of ninety years' imprisonment.

Dreshawn Luna's counsel emphasized that Luna was fifteen years old at the time

of the offense. Counsel argued that the court was sentencing someone who was "not

fully formed" at the time of the crimes and related the principles enunciated in *Miller v.*

*Alabama*. Luna's impulsivity had been noted in the presentence report and no planning preceded the tragic crime. In addition, Luna came from a broken home. His mother lacked time to assist him. Accordingly, at a very young age, Luna entered the gang and crime culture. Counsel argued that the sentencing scheme at play, which subjected a juvenile offender to the same sentence as an adult, improperly removed youth from the court's meaningful consideration. Counsel requested a sentence below the mandatory minimum.

The sentencing court expressed deep concern about Dreshawn Luna's lengthy history of involvement in the juvenile justice system, commencing at age nine. The court stated that it carefully considered Luna's age, the circumstances surrounding his upbringing and home life, the impact of his life on the streets, and his prospects for potential restoration to useful citizenship. The court emphasized that, throughout Luna's lifetime, he had received many opportunities from the variety of probation officers and individuals that worked with him. Luna instead repeatedly demonstrated an unwillingness to conform his conduct to community norms. According to the sentencing court, Luna might be a child in many ways, but not for purposes of sentencing following a conviction of first degree murder.

On appeal, Dreshawn Luna challenged the constitutionality of the length of his sentence because of his youth. In turn, the State contended that the trial court imposed the sentence only after considering Luna's youth and its attendant circumstances. The State argued that the sentencing court reviewed voluminous information, including the

presentence report, argument, letters, and the trial record that allowed it to adequately consider all of the relevant factors attendant to Luna's youth. The evidence included the circumstances of the offense, Luna's youth and immaturity, outside negative influences, home environment, lack of rehabilitation, role in the offense, ability to participate in his defense, and prior juvenile history. According to the State, because of the volume of evidence before the trial court, the court necessarily considered all of the *Miller* factors.

The Illinois Court of Appeals agreed that the trial court considered Dreshawn Luna's youth, but disagreed that the sentencing court considered all of the *Miller* factors. The trial court expressly gave great weight to youth and was deeply swayed by defendant's tender age. The trial court had also stated he considered Luna's broken family life and the impact on him from street-gang influences. Nevertheless, the trial court found that Luna's juvenile record of burglary, theft, and revocations of probation, did not bode well for his rehabilitation capacit, as he had not yet reformed his conduct, despite attempts at intervention. The court considered psychological evaluations and caseworker comments in the presentence report. But, according to the Court of Appeals, the admission of evidence and argument related to the *Miller* factors did not necessarily mean that the sentencing court adequately considered or evaluated the factors when discerning whether Luna was the rare juvenile beyond the possibility of rehabilitation. The trial court seemed to believe he must impose a sentence within the minimum length permitted for adults. More importantly, for Adrian Mendoza's appeal, the reviewing court deemed that considering an offender's youth did not equate to a finding that a

defendant is the rare juvenile who committed conduct showing irreparable corruption beyond the possibility of rehabilitation. The court emphasized that juveniles will possess delinquency histories and failed attempts at intervention. The crimes at issue, while horrible and senseless, were consistent with impulsive and immature behavior.

In *Fletcher v. State*, 532 P.3d 286, 290 (Alaska Ct. App. 2023), the Alaska court reversed a sentence of life without the possibility of parole imposed on an offender who murdered two people while age fourteen. Five mental health professionals, who had evaluated Winona Fletcher, testified to her amenability to treatment. Fletcher's mother, Susan Schubert, testified regarding Fletcher's unstable and traumatic upbringing. Fletcher had experienced sexual, physical, and emotional abuse from the key adults in her life — including Schubert, Schubert's boyfriend, and her maternal grandmother and step-grandfather. Fletcher was also subjected to a chaotic living environment marked by frequent moves, alcoholism, and illegal drug use. Schubert was evicted from her residence shortly after Fletcher's fourteenth birthday, leaving Fletcher with no way to locate her. Fletcher began prostituting herself in downtown Anchorage. During this time, Cordell Boyd befriended Fletcher, and, according to her, Boyd was the only person who cared for her. Boyd had encouraged Fletcher to perform the killings.

The Alaska Court of Appeals deemed the sentencing court's remarks cursory. The sentencing court acknowledged that, according to an updated evaluation from one of the experts, Fletcher had made some progress. But the court noted that the expert could offer no explanation for Fletcher's conduct. The sentencing court deemed Fletcher's

rehabilitation unlikely because he could not discern why Fletcher committed the crimes. In reversing, the reviewing court noted that, before issuing a life sentence, the sentencing court must affirmatively consider the juvenile offender's youth and its attendant characteristics and to provide an on-the-record sentencing explanation that explicitly or implicitly finds that the juvenile offender is one of the rare juvenile offenders whose crime reflects irreparable corruption. The sentencing court must provide a sufficiently detailed record of its reasoning to facilitate review. The sentencing judge had given little to no consideration to Fletcher's chaotic family environment and the evidence of neglect and abuse she endured as a child.

------------------------------------------------------------

With the legal treatise ended, I analyze Adrian Mendoza's and the State's respective positions on appeal and the sentencing court's ruling. In the context of Adrian Mendoza's appeal, I review the nine *Miller* factors: (1) chronological age, (2) immaturity, impetuosity, failure to appreciate risks and consequences, (3) the surrounding family and home environment, (4) the circumstances of the offense, (5) the extent of the offender's participation in the offense, (6) any pressures from friends or family affecting him, (7) the inability to deal with police officers and prosecutors, (8) incapacity to assist an attorney in his or her defense, and (9) the possibility of rehabilitation.

Adrian Mendoza was seventeen years of age at the time of the crime. Although Adrian was only one year less than legal adulthood, the Washington Supreme Court directs the application of the *Miller* factors to young adults at least to age twenty-one,

43

four years beyond Adrian's age. *In re Personal Restraint of Monschke*, 197 Wn.2d 305, 311 (2021). Adrian's ability to critically reason and weigh risks remained limited because of incomplete development of his brain. The first factor favors Adrian.

Factor two also favors Adrian Mendoza. The State argues that Adrian did not act impulsively when shooting Andrea Nunez. The State emphasizes that minutes transpired between when Adrian spotted Nunez and her boyfriend. According to the State, Adrian must have exercised reasoning when firing the shots because of the presence of a security camera that recorded the events and because Adrian left his cellphone at the scene. Even without reweighing the evidence, the conclusion drawn by the State makes little sense.

Unlike in *State v. Anderson*, the State presented no evidence of preplanning the killing. Adrian Mendoza was intoxicated and had not slept for four days. Mendoza did not know in advance that Andrea Nunez and Joseph Ayala would walk in front of the apartment at 4:15 in the morning. When Adrian saw the rival gang members, he quickly exited the apartment, an impulsive act. Adrian took a gun with him, but the State presented no evidence that Adrian grabbed a gun inside in order to shoot. Because of the ready accessibility of guns in American society, Adrian may have routinely bore a gun. Adrian, within seconds, yelled his gang's name. Nunez immediately responded, in turn, with the rival gang's name. Adrian instantly fired his gun. These facts show no planning, but rather a series of impetuous acts.

Even a finding that the juvenile offender committed murder deliberately and with premeditation means little when determining whether the crime resulted from transient

44

immaturity. *Commonwealth v. Batts*, 640 Pa. 401, 163 A.3d 410, 437 (2017), *abrogated by Jones v. Mississippi*, 593 U.S. 98, 141 S. Ct. 1307, 209 L. Ed. 2d 390 (2021)). A horrible and senseless crime can be consistent with impulsive and immature behavior.

The State writes that Adrian Mendoza knew the risks and consequences of his act, but then the State employs evidence that shows the contrary. The State emphasizes that Adrian lost his cellphone at the scene, an event that no one would plan. An adult, who had planned a murder, would have double checked whether he left evidence at the scene. Adrian's constant modifications to his story, as told to law enforcement officers, did not show him to be an adult, to be intelligent, or to be able to render reasoned decisions. A smart adult would remain silent, ask for a lawyer, and, if he talked, would formulate a reasonable alibi in advance. Adrian did not withstand a police interview, as claimed by the State, but rather broke under the questioning by modifying his story.

The State highlights Adrian Mendoza's frequent incursions into the juvenile justice system as depicting adulthood. As in *People v. Luna*, Adrian gained a history within Washington's juvenile justice system. This history does not, however, show maturity in Adrian. This history proves the opposite. Adrian made poor decisions because of his age and upbringing.

Even when a teenager's cognitive capacities approach those of adults, adolescent judgment and their actual decisions may differ from that of adults as a result of psychosocial immaturity Steinberg, L., & Scott, E. S. (2003), "Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile

Death Penalty," *American Psychologist*, 58 (12), 1009. https://doi.org/10.1037/0003-066X.58.12.1009. To the extent that adolescents are less psychologically mature than adults, they are likely to be deficient in their decision-making capacity, even if their cognitive processes are mature. Steinberg & Scott, 1012.

The sentencing court may have considered that Adrian Mendoza's ease of getting a gun showed his being an adult. The State expressed concern about the ease of acquiring a gun, but the State did not explain how access to guns suggests one to be an adult. Adrian's acquisition of firearms may only illustrate America's worship of guns, the excess numbers of firearms in our nation, and ready access to guns.

The State claims Adrian Mendoza lived as an adult because of his truancy from school, his associating with gang members, his committing crimes, his befriending an eighteen-year-old woman, and his impregnating the woman. Fathering a child at age fifteen and skipping school illustrate recklessness, and immaturity, if not stupidity, not maturity or adulthood. Fathering a child without financial resources also proves irresponsibility.

The sentencing court rejected the notion of Adrian Mendoza's crime being the result of immaturity and impetuosity primarily because of the conditions in which Adrian lived. He lived outside the confines of his mother's house and without any adult supervision. But no tie links homelessness and living on one's own to maturity, reasoned decisions, and lack of impulsiveness. The contrary is generally true. Adrian did not live on the streets because of his ability to render sound decisions. He lived on the streets

because his father was either dead or in Mexico and his drug addled mother provided him no support. Dr. Alexander Patterson opined that the trauma, anger, and stress from being a homeless teenager causes poor decision-making rather than effectuating good judgment. Commonsense also dictates such a conclusion.

*State v. Bassett*, 192 Wn.2d 67 (2018) defeats the State's emphasis that Adrian Mendoza lived on his own like an adult for many years before the murder. Brian Bassett's parents expelled him from home and he lived in a shack with a friend. In a later decision, one dissenting Washington Supreme Court justice also acknowledged the discord between attributing maturity with living on one's own. The dissenter characterized the trial court's conclusion as a "profound misinterpretation of the evidence." *State v. Anderson*, 200 Wn.2d 266, 302 (2022) (Gonzalez, C.J., dissenting).

The State's contention that Adrian Mendoza acted and lived as an adult begs the mention of the psychological concept of adultification. Adultification occurs when a person in a position of authority treats a child as an adult because the child's circumstances forced him to live as an adult or render adult decisions. Empirical literature, as acknowledged by the Washington Supreme Court, establishes that Black children are prejudiced by, in addition to other stereotypes, "adultification," or the tendency of society to view Black children as older than similarly aged youths. *State v. Anderson*, 200 Wn.2d 266, 312 (2022) (Yu, J. dissenting); *In re Personal Restraint of Miller*, 21 Wn. App. 2d 257, 265 (2022); *see* GENDER & JUST. COMM'N, WASH. CTS., 2021: HOW GENDER AND RACE AFFECT JUSTICE NOW 452-53 & nn.96-97 (2021),

https://www.courts.wa.gov/subsite/gjc/documents/2021_Gender_Justice_Study_Report.pdf. Adultification bias results in juvenile offenders of color being viewed as more blameworthy and deserving of harsher punishment than their white counterparts. *State v. Anderson*, 200 Wn.2d 266, 312 (2022) (Yu, J. dissenting); 2021: HOW GENDER AND RACE AFFECT JUSTICE NOW, *supra*, at 453. Adultification extends to America's Latinx community.

Adrian Mendoza experienced separation from his father and his sisters. He suffered from a distracted mother. Family separation generates tremendous suffering, ripples through generations, and impacts communities well beyond the immediate family. Adrienne Garro et al., *A Consultation Approach to Target Exclusionary Discipline of Students of Color in Early Childhood Education*, 25 CONTEMP. SCH. PSYCH. 14, 130 (2021). The act of separating a child from family engenders feelings of guilt, post-traumatic stress disorder, isolation, substance abuse, anxiety, low self-esteem, and despair. Garro et al., *supra*, at 138.

Youth homelessness and juvenile court involvement are not separate issues, but rather are overlapping challenges that have a two-way relationship. Youth experiencing homelessness report a high level of involvement with the juvenile legal system and youth involved with the juvenile legal system are more likely to report unstable housing. Garro et al., *supra*, at 150. Youth of color are more likely to be trapped in a cycle of homelessness and detention because of the systemic racism and structural barriers inherent in our housing and law enforcement systems. Garro et al., *supra*, at 151-52. A

delay in full development of self-reasoning and self control particularly breeds in youth exposed to trauma, which is common among young people – especially children of color – who have criminal justice contact at a young age. Garro et al., *supra*, at 20. The plight of homelessness and mental health struggles disparately impact youth of color. RACE & CRIM. JUST. SYS., TASK FORCE 2.0: RACE AND WASHINGTON'S CRIMINAL JUSTICE SYSTEM: 2021 REPORT TO THE WASHINGTON SUPREME COURT (2021), https://digitalcommons.law.seattleu.edu/korematsu_center/116 [https://perma.cc/D5C4-4HHA]

The *Miller* factor of family background cries for leniency for Adrian Mendoza. Adrian experienced as worse, if not worse, of a childhood than that of Cristian Delbosque. Remember the Supreme Court deemed Delbosque to have a background that merited special sentencing rather than a sentence at the high end. Adrian had no father and no functioning mother. He suffered sexual, physical, and verbal abuse. His mother's friends started Adrian on illicit drugs at the age of ten. He became addicted to drugs. He lived on the streets without money for food. His family background was not conducive to maturation. Only third world children facing war and famine may experience a worse childhood than Adrian Mendoza. Yet, the sentencing court imposed the highest possible sentence.

I can easily understand the immaturity of Adrian Mendoza when comparing his background to my home environment. I was born into a middle-class white family with parents who loved and cared for me. In addition to my parents, I had four siblings on

which to rely. I never worried about going hungry or about a place to rest at night other than a trap house or the street. I was not sexually abused. Although, I was tempted by friends to smoke marijuana, the temptation ended there. I had no parental figures encouraging me to join in drug parties. With my background, I am moved to tears when considering Adrian's background.

A common refrain advanced by the State at sentencing hearings asserts that other children with poor backgrounds overcome their obstacles to be crime free and successful. This mantra is too easy to utter. The refrain is the juvenile justice rendition of Horatio Alger's myths. Researchers with the U.S. Partnership on Mobility from Poverty found that only sixteen percent of children raised in poverty succeed in life. The intonation of the State's catchphrase fails to recognize the varied backgrounds and capabilities of children. Taking this mantra to its extreme, no purpose would be served by the line of United States Supreme Court and Washington Supreme Court cases demanding that courts treat children different. The State and the sentencing court could always reject lenient sentencing with the refrain. In short, *Miller* factor three benefits Adrian.

Factors four and five disfavor Adrian Mendoza. He committed a horrific crime, the killing of another human being. Andrea Nunez's family now suffers a gaping hole in their lives. Adrian was the principal participant in the crime. He deserves some punishment.

Factor six benefits Adrian Mendoza. Like any teenager, he was subject to peer pressure. Joining a gang adds more pressure to engage in criminal misbehavior. Dr.

Alexander Patterson opined as to this peer pressure. The sentencing court mentioned that it needed to consider the peer pressure imposed on Adrian Mendoza. But then the court never discussed peer pressure and may have impliedly concluded, without any evidence, that Adrian encountered no peer pressure. The State emphasizes that Adrian Mendoza never told law enforcement that he acted from peer or gang pressure. But Adrian need not tell law enforcement the obvious.

Factor seven addresses the youth's ability to interface with police officers and prosecutors. The parties did not develop facts relevant to this factor. A teenager's repeat contact with police and prosecutors says little about an ability to deal with law enforcement officials. One might conclude that a youth must be unable to successfully navigate police and prosecutors if he constantly returns to juvenile detention. Adrian Mendoza did not intelligently relate to officers after his detention for murder. He should have remained quiet and solicited the help of counsel instead of constantly changing his story.

*Miller* factor eight lists the youth's incapacity to assist an attorney in his or her defense. Presumably, this factor holds more relevance to the interaction with defense counsel near the time of the crime than four years later. This factor favors Adrian Mendoza. According to his defense counsel, Adrian refused to help her at the beginning of her representation. Adrian wrote a letter to the court asking for the removal of an accomplished defense attorney.

51

The ninth, most important, and last *Miller* factor favors Adrian Mendoza. The sentencing court recognized that Adrian had the potential for rehabilitation, a critical factor that shows Adrian to lack depravity. The State presented no evidence demonstrating Adrian's incapacity for rehabilitation. The State presented no evidence of disciplinary misconduct in jail.

The court and the State underscored Adrian Mendoza's failure to participate in services and programs available to a juvenile. Assuming the State references programs during which Adrian was on parole, the State never asked whether Adrian possessed the resources, such as transportation, to participate in programs.

Attempts by the juvenile justice system to earlier correct Adrian Mendoza, as stated in *People v. Luna*, does not establish depravity but instead shows, as opined by Alexander Patterson, his youth interfered in rehabilitation as a teenager. Juveniles sentenced for murder will inevitably possess delinquency histories and failed attempts at intervention.

After four years in incarceration pending trial in the murder prosecution, the undisputed evidence showed a change and maturation in Adrian. At his sentencing, Adrian expressed deep sorrow and remorse for his crime. The State does not contend that this statement of contrition lacked sincerity. This factor alone calls for a lesser sentence.

In its ruling, the sentencing court did not weigh any of the *Miller* factors. The court did not express that other factors outweighed Adrian Mendoza's youthfulness and his potential for rehabilitation. The sentencing court did not provide a reason to impose

52

the same sentence on Adrian that would be imposed on an adult. The sentencing court did not address how use of alcohol, marijuana, methamphetamine, and cocaine impacted Adrian's ability to reason or how his intoxication and sleep deprivation on the morning of the murder impacted his capability to weigh risks.

The sentencing court never questioned the credibility of any witness, including Adrian, Adrian's sisters, and Alexander Patterson. Neither the State nor the court challenged Adrian's rendition of his background. The court's decision instead focused on retribution for the unnecessary and cruel death of Andrea Nunez.

In *State v. Delbosque*, this court and the Supreme Court reversed the resentencing court's ruling because of its failure to fully address opinions of the experts that indicated Cristian Delbosque acted as child when committing murder. Because of Delbosque's poverty, sexual abuse, physical assaults, and teen alcoholism, his brain did not function like an adult brain. Dr. Alexander Patterson expressed similar conclusions about Adrian Mendoza's lack of maturity, in part because of substance abuse. The sentencing court never explained why she rejected Patterson's opinions.

I note that the State remarked that it reduced charges against Adrian Mendoza from first degree murder to second degree murder in order to procure a shortened sentence. But this court still must analyze the sentence based on the charge being second degree murder, the only charge to which Adrian pled guilty. Also, because of the lack of any planning, the State may have encountered obstacles proving first degree murder.

The sentencing court, through no fault of her own, did not conduct an evidentiary sentencing hearing. I have observed, as a substitute superior court judge, that parties rush to a sentencing hearing after the guilt phase of the trial. The parties spend less time and resources on the sentencing phase of the proceeding. When critical decisions such as sentencing a youth arise, a thorough evidentiary hearing may be warranted. In *State v. Delbosque*, 195 Wn.2d 106 (2020), the court conducted a four-day evidentiary sentencing hearing.

I would remand to the superior court for resentencing with directions to meaningfully consider and weight the *Miller* factors.

I respectfully dissent,

_____
Fearing, J.